STATE of Alaska, DEPARTMENT OF REVENUE, Appellant,

v.

Stephen M. OLIVER and Mona L. Oliver, Appellees.

Roger PICKLES, Appellant,

v.

STATE of Alaska, DEPARTMENT OF REVENUE, Appellee.

Nos. 4755, 5049.

Supreme Court of Alaska.

Nov. 20, 1981.

In No. 4755, Thomas R. Wickwire, Asst. Atty. Gen., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellant.

Appellees Stephen and Mona Oliver appear pro se.

In No. 5049, appellant Roger Pickles appears pro se.

David T. LeBlond, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.*

## OPINION

RABINOWITZ, Chief Justice.

These appeals involve the refusal by individual taxpayers, on the basis of constitutional privilege, to provide any information on their state income tax returns regarding

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

the amount or source of income, and then subsequently refusing to comply with an administrative summons issued under AS 43.05.040, ordering them to appear and testify regarding their tax liability and to produce records pertinent to determining their tax liability. Pickles "gifted" the state $203 in lieu of paying taxes. The records demanded of the Olivers (husband and wife) were W–2 forms received from employers "or pay records", bank statements, credit union statements, and copies of their federal tax returns for various years. The summons directed to Pickles was worded more broadly, directing him to produce

> all books, records, and papers necessary to determine the correct Alaska Individual Net Income Tax Liability for the year 1977. This may include but is not limited to the following: cash receipts and disbursement records, checking and saving account records, stock and real estate records, all W–2 forms or pay records from all employers[,] workpapers, ledgers, journals, etc.

Pickles and the Olivers appeared in response to these summonses. The state apparently did not seek testimony from the Olivers, but the Olivers refused to produce any of the documents sought. Pickles eventually appeared twice before the tax auditor but brought none of the documents requested and refused to answer questions on the tax return on the basis of "the First, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth and Fourteenth" amendments.

Pickles and Stephen Oliver were jailed for civil contempt after appearances before the superior court to show cause for not complying with the summonses. Both have since been released: Oliver after the superior court granted a motion for reconsideration and decided the Olivers were entitled to refuse to comply with the summons based on Fifth Amendment grounds, and Pickles after this court stayed the contempt order against him pending appeal.

The state is the appellant in No. 4755 and the appellee in No. 5049. Pickles and the Olivers are appearing *pro se* against the state in these appeals. The Olivers have relied on the Fifth Amendment to the U.S. Constitution, its counterpart in the Alaska Constitution, and the right to privacy in the Alaska Constitution to support their position. Pickles, in addition to relying on the authorities cited by the Olivers, cites the Fourth Amendment and its state counterpart and the language of AS 43.05.040. He disputes the propriety of holding him in contempt for his actions, and asserts other deficiencies.

We reverse the ruling of the superior court in each case.

Before turning to the major legal issues presented in these appeals we will initially address several minor issues which have been raised.

I. Whether AS 43.05.040(a)[1] authorizes the summons which was issued by the Department of Revenue in Pickles's case.

■ Pickles argues that AS 43.05.040(a) does not support the summons issued here.

1. AS 43.05.040 provided at the relevant time:
    *Inspection of records or premises and issuance of summons.* (a) The department may examine the books, papers, records, or memoranda of any person to ascertain the correctness of a return filed or to determine whether a tax is due, or in an investigation or inspection in connection with tax matters. The records and the premises where a business is conducted shall be open at all reasonable times for official inspection, and the department may summon any person to appear and produce books, records, papers, or memoranda bearing upon tax matters, and to give testimony or answer interrogatories under oath respecting tax matters, and the department may administer oaths to persons who are so summoned.
    (b) A summons may be served by the commissioner of public safety or a peace officer designated by him or by a person designated by the Department of Revenue. If a person who is summoned neglects or refuses to obey the summons issued as provided in this section, the department may report the fact to the superior court and the court may compel obedience to the summons to the same extent as witnesses may be compelled to obey the subpoenas of the court.
    The statute was amended in 1980 to encompass oil and gas royalties under AS 38.05 as well as tax matters. Ch. 61, § 4, SLA 1980.

Pickles contends that the only books and papers AS 43.05.040(a) opened to inspection by the Department of Revenue are certain business records, and those only at reasonable times. In our view Pickles has misread the statute and thus his argument is without merit.

II. Whether the Department of Revenue's failure to affix the seal of the Commissioner of Revenue to the summons which was issued in Pickles's case precludes its enforcement.

■ AS 43.05.010(6) states that the Commissioner of Revenue shall "adopt a seal and affix it to each order, process, or certificate issued by him." The state did not affix such a seal to the summons which was issued to Pickles, but this defect was brought to the attention of the superior court, which apparently concluded that since there was no doubt as to the authenticity of the summons, this error was harmless. Since Pickles appeared in response to the summons and has otherwise treated it as authentic, we conclude that this technical defect was harmless error.

III. Whether the superior court was authorized to order Pickles incarcerated for civil contempt for refusing to comply with the summons.

■ Pickles's primary contention is that he cannot be jailed for contempt be-

cause his actions were in good faith and not willful. We find this argument non-meritorious. Bad faith is not a prerequisite to a finding of civil contempt, which is intended not to punish the contemnor for having flouted the court's authority, but to coerce future conduct. *See L.A.M. v. State*, 547 P.2d 827, 832 (Alaska 1976). Willfulness is a prerequisite, but only in the sense that the act ordered must be within the power of the defendant to perform.[2] We have held that inability to comply is an affirmative defense to a contempt charge, with the burden of proof on the defendant. *Johansen v. State*, 491 P.2d 759, 766 (Alaska 1971). Here, Pickles raised no issue and presented no evidence that he was unable to comply, beyond asserting that some of his refusals were based partially on his confusion as to what was meant by certain monetary terms.

IV. Whether constitutional rights against self-incrimination, under the federal or Alaska Constitution, protect Pickles and the Olivers from testifying or producing the documents requested by the administrative summonses.

A. Failure to file a return.

■ The state characterizes the taxpayers' stance as an assertion that they have a right to refuse to comply with the requirement that they fill out a tax return.[3] It is

That amendment has no effect on the issues here.

2. AS 09.50.050 provides:
   *Imprisonment to compel performance of an act.* When the contempt consists of the omission or refusal to perform an act which is yet in the power of the defendant to perform, he may be imprisoned until he has performed it.
   We recognize that, in *Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976), the Supreme Court reaffirmed that good faith would be a defense to a prosecution under 26 U.S.C.A. § 7203, which proscribes willful failures to make returns. *Id.* at 663 n.18, 96 S.Ct. at 1187 n.18, 47 L.Ed.2d n.18. The Court also noted, however, that a § 7203 prosecution differed from a contempt citation in that, in the latter case, the taxpayer has the benefit of a preliminary judicial ruling on his claim of privilege, on the basis of which

he may reconsider his refusal to answer. *Id.* at 663–64, 96 S.Ct. at 1187, 47 L.Ed.2d at 383. Regardless, this is a matter of the interpretation of § 7203 only, and as such does not require us to interpret AS 09.50.050 in the same manner.

3. We think the state is correct in characterizing the taxpayers' positions here as "blanket" assertions of the privilege. All of them filed returns containing no financial information. Pickles's form contained asterisks in the spaces provided for answers to each query, which referred to notations in the margin citing the Fifth Amendment as well as several other constitutional amendments, and expressed confusion over the meaning of "dollars," "legal tender," and other monetary terms, but gave no concrete basis for his belief that any specific question would tend to incriminate him. The superior court subsequently ordered a hearing

well established that no such right exists under the Fifth Amendment or other provisions of the U.S. Constitution. The privilege against self-incrimination does not extend to a right to refuse to file any return at all. *United States v. Sullivan,* 274 U.S. 259, 263, 47 S.Ct. 607, 71 L.Ed. 1037, 1039 (1927). A blanket refusal to disclose any financial information on the return on the basis of the Fifth Amendment is equivalent to filing no return at all.[4]

*California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), which dealt with a California statute requiring the drivers of vehicles involved in an accident to stop at the scene and give their names and addresses, established that a balancing between legitimate government functions and the interests of the individual is required in situations where self-reporting is a part of a regulatory scheme. *Id.* at 427, 91 S.Ct. at 1537, 29 L.Ed.2d at 17. This entails "an evaluation of the assertedly noncriminal governmental purpose in securing the information, the necessity for self-reporting as a means of securing the information, and the nature of the disclosures required." *Id.* at 454, 91 S.Ct. at 1551, 29 L.Ed.2d at 32 (Harlan, J., concurring). Justice Harlan's concurrence treated the subject thoroughly,

referring to *Sullivan* and noting that compelled self-disclosure was essential to the government's legitimate taxing power. *Id.* at 436, 455, 91 S.Ct. at 1541, 1551, 29 L.Ed.2d at 24, 33. The facially neutral character of the questions on a tax return and their direction to the public at large, for an essentially non-criminal purpose, minimize the hazards of self-incrimination and thus justify this limitation upon the assertion of the privilege. *Id.* at 429–32, 91 S.Ct. at 1538–1540, 29 L.Ed.2d at 18–19.

■ This does not prohibit a person from claiming his Fifth Amendment privilege by specific answer to selected individual questions on the return. *United States v. Sullivan,* 274 U.S. at 263–64, 47 S.Ct. at 607–608, 71 L.Ed. at 1039–40; *United States v. Malnik,* 489 F.2d 682, 685 (5th Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974). The inquiry does not end, however, with assertion of the privilege in response to a specific question.[5] Thus, the taxpayer bears some burden of asserting facts which will indicate to the judge that the answer to each question for which the privilege is asserted may incriminate him, or at least it must be apparent from the context of the question that such is the case. While this burden is not great,[6] the taxpayer is not

---

at which the Revenue representatives propounded each question on the return to Pickles individually and asked for his basis for refusing to answer each. Pickles again refused to answer nearly all the questions, asserting several constitutional amendments as his reasons, again without providing any factual or theoretical basis for his claim other than a general fear of prosecution by the federal government. The Olivers' returns are not in the record but, as described in the superior court's opinion, contained no basis for their refusal to answer any questions regarding their income status on the form beyond a bare assertion of the Fifth Amendment. The Olivers maintain in their brief that they avoid the "blanket assertion" defect because they made specific Fifth Amendment objections on the face of the return, but again, they never provided the superior court with any concrete reasons for asserting the privilege at the hearing to enforce the summons.

**4.** "The matter in issue is not new. The law is now established that failure to provide any information is tantamount to no return at all." *United States v. Brown,* 600 F.2d 248, 251 & n.1

(10th Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979) and cases cited therein. *See also United States v. Silkman,* 543 F.2d 1218 (8th Cir. 1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977).

**5.** As stated in *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951) (citations omitted):

[T]his protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, and to require him to answer if 'it clearly appears to the court that he is mistaken.'

**6.** The burden is described in *McConkey v. State,* 504 P.2d 823, 825 (Alaska 1972), *quoting Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–819, 95 L.Ed. 1118, 1124 (1951):

excused from answering where there is no evidence of any "substantial and 'real' ", as opposed to "trifling or imaginary", hazard of incrimination. *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889, 901 (1968); *E.L.L. v. State,* 572 P.2d 786, 788 (Alaska 1977).[7]

In *United States v. Brown,* 600 F.2d 248 (10th Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979), the court commented:

> The appellant here is not aided by *Garner* and *Sullivan* because he attempts to use the Fifth Amendment to avoid disclosing even the amount of his income and this is not protected by the Fifth Amendment. Instead it is a simple attempt to prevent the communication to the government of the amount of the tax. Necessarily it is an illegal effort to stretch the Fifth Amendment to include a taxpayer who wishes to avoid filing a return . . . .
>
> [T]he claim of privilege is not allowed to accomplish avoiding the disclosure of in-

formation as to tax liability. After all, the entire theory of income tax is based upon individual disclosure, and the compelling of income tax filing is fully recognized as not violating the Fifth Amendment.

*Id.* at 252 (footnotes omitted).

■ The only suggestion of any potential for incrimination in the cases at bar is that of criminal prosecution for willful failure to file or to pay tax, if the parties in fact have sufficient income to be required to file a return and they owe the State of Alaska any money. But claiming a right to refuse to disclose income information in a return on the grounds that it will establish tax liability and thus the potential for criminal prosecution for disobedience to the income tax laws is a bootstrapping argument that could defeat the legitimate power of the government to tax income. It has been explicitly rejected in *United States v. Brown, id.* at 251–52, and also in *Daly v. United States,* 393 F.2d 873, 877 (8th Cir. 1968).[8] Neither Pickles nor the Olivers

---

To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

7. Cases have suggested that there is no privilege against disclosing amount of income, *United States v. Sullivan,* 274 U.S. 259, 263–64, 47 S.Ct. 607, 608, 71 L.Ed. 1037, 1040 (1927); *United States v. Brown,* 600 F.2d 248, 252 (10th Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979). There has also been skepticism expressed that the privilege could be successfully asserted as to most other information sought on the return because of the innocuous nature of the questions. *Daly v. United States,* 393 F.2d 873, 878 (8th Cir. 1968).

8. For a comparison of the posture of the taxpayers in this appeal with those whose convictions for willful failure to file federal income tax returns have been sustained, see the following cases:

United States v. Brown, 600 F.2d 248 (10th Cir.), cert. denied, 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979) (returns disclosed no income information; words such as "unknown," "Fifth Amendment," and "privacy" inserted in reply to specific questions); *United States v. Johnson,* 577 F.2d 1304 (5th Cir. 1978) (blanket claim to Fifth Amendment and other

objections attached to return with no income information provided); *United States v. Irwin,* 561 F.2d 198 (10th Cir. 1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 725, 54 L.Ed.2d 755 (1978) (return contained only name, address, claim of entitlement to refund, and, in response to each question dealing with income, the entry "Object-Self-incrimination"); *United States v. Jordan,* 508 F.2d 750 (7th Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 62 (1975) (return contained only the taxpayer's name, address, social security number, and a blanket declaration of the Fifth Amendment privilege); *United States v. Daly,* 481 F.2d 28 (8th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973) (returns provided only name, occupation, and signature, with exhibit attached objecting to the income tax as unconstitutional and asserting blanket Fifth Amendment privilege; taxpayer made no showing of how disclosure of information would incriminate him); *United States v. Porth,* 426 F.2d 519 (10th Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970) (return contained only name and references to various constitutional provisions alleged to excuse taxpayer from filing a return).

The Ninth Circuit has recently made its position clear. It has rejected, in a prosecution for failure to file a federal tax return, a defense of the privilege against self-incrimination, where it was undisputed that the filing would have provided a lead or clue to evidence having a

have expressly made this contention in these appeals.

### B. Resistance to the administrative summonses.

Here the state has not prosecuted the taxpayers for failure to file a return. Instead, the state has sought to determine the tax liability of the Olivers and of Pickles by compelling their testimony and production of their records through administrative summonses. There is a split of authority whether the potential of criminal prosecution for tax violations, which does not justify a blanket refusal to file returns, may justify refusal to comply with a summons.

The superior court below relied on *United States v. Daly*, 68–2 U.S. Tax Cas. (CCH) ¶ 9617 (D.Minn.1968).[9] In that case, the district court, after remand, reversed its own contempt order following Daly's refusal, on the basis of his privilege against self-incrimination, to answer a series of questions propounded to him because "[a]s to each question asked, it is evident from the implications of the question in the setting in which asked that a responsive answer to the question may tend to incriminate Jerome Daly." *Id.*, 68–2 U.S. Tax Cas. (CCH) at 88,123. The transcript of those proceedings, supplied to us in the record, reveals that the judge's position in that case was that the IRS, when faced with a tax return containing conclusory assertions of the privilege against self-incrimination instead of income information, may prosecute for failure to file a return, but it may not compel answers to the questions in that return as long as a sufficient showing of a tendency to incriminate is made. This ruling was not appealed to the Eighth Circuit.

One court of appeals has stated, however, that its decision to give effect to an administrative summons for financial records relevant to civil proceedings for collection of income tax was "squarely planted" on a representation by the IRS that the investigation had no purpose of eventual criminal prosecution, and ruled that no information obtained under the summons could be used for such prosecution; this may indicate that, absent this assurance, the court would not have found the summons to be enforceable. *Hinchcliff v. Clark*, 371 F.2d 697, 701 (6th Cir.), *cert. denied*, 387 U.S. 941, 87 S.Ct. 2073, 18 L.Ed.2d 1327 (1967).

More recent cases have taken a contrary position. In *United States v. French*, 442 F.Supp. 166 (N.D. Iowa 1977), *aff'd*, 567 F.2d 351 (8th Cir. 1978), the court enforced an IRS summons because, "[e]ven if the records could later be used for criminal prosecution, where the initial investigation is civil in nature and no criminal investigation has been initiated, the fifth amendment will not bar production. Only where the sole purpose of the investigation is criminal may production be successfully challenged." *Id.* at 168 (citation omitted). Other cases have upheld such summonses

---

tendency to incriminate, in that the taxpayer was facing a real and appreciable hazard of prosecution for having previously filed a false withholding form (having claimed 99 withholding exemptions). *United States v. Carlson*, 617 F.2d 518 (9th Cir.), *cert. denied*, 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 468 (1980). The court, acknowledging that the situation would justify the defendant's assertion of the privilege against self-incrimination other than under the tax laws, refused to allow the assertion here, noting that the assertion was part of a scheme to avoid tax liability and that the privilege was being used more as a sword than as a shield. *Id.* at 522. The court also noted that "[w]ere taxpayers permitted to employ Carlson's scheme, they could avoid filing completed tax returns and thereby severely impair the government's ability to determine tax liability." *Id.* at 523.

9. This decision was an intermediate step in a much longer saga. Daly was initially jailed for contempt upon refusal to comply with an IRS summons, but on appeal the Eighth Circuit remanded the case for a plenary hearing in which Daly could explain his reasons for asserting the privilege as to each question and as to the records. *Daly v. United States*, 393 F.2d 873 (8th Cir. 1968). It was upon remand that the district court made the ruling noted in the text, which was never appealed. Instead, the IRS took the district court judge's advice and prosecuted Daly for failure to file a return, rather than seeking a contempt citation for failure to comply with the summons. His conviction on this charge was subsequently upheld by the Eighth Circuit. *United States v. Daly*, 481 F.2d 28, 30 (8th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973).

without inquiry as to the nature of the investigation. *Russell v. United States*, 524 F.2d 1152 (8th Cir. 1976); *United States v. Ponder*, 475 F.2d 37 (5th Cir. 1973).

■ We must reject the *Daly* position. If the court is convinced that the responses to be evoked from the taxpayer, whether on the tax return or in response to a summons or subpoena, would tend to incriminate the taxpayer, then those responses ought to be privileged in both contexts. The *Daly* court held that such responses would be privileged for purposes of the summons, but not for the tax return. We think this inconsistent; the Supreme Court has clearly indicated that, if truthful answers to particular questions on the tax return would tend to incriminate the individual, then the privilege can be validly claimed as to those questions in a prosecution for failure to file. Thus, if the court in *Daly* found that a responsive answer would tend to incriminate the individual, then the prosecution for failure to file, as well as the contempt order, should have failed. Conversely, if the prosecution for failure to file was valid, then the contempt order should also have been.

■ Thus, since we have concluded that the taxpayers here made an insufficient showing of a substantial and real hazard of incrimination as to their failures to respond to questions on the tax return, which is tantamount to a failure to file, we must reach the same conclusion as to their failures to comply with the administrative summonses. Whether the government demand is for written answers on a return, oral responses to a revenue agent's questions, or records which establish the amount of income, the Fifth Amendment question is the same—whether the answer to a specific question or the production of a particular document poses a real hazard that the taxpayer will be exposed to criminal prosecution through his own testimony. Whether prosecuted for failing to file a return or jailed for civil contempt, the taxpayer is suffering a penalty for refusing to provide the information. But sustaining a claim of the privilege to prevent prosecution either for failing to provide the information on the form in the first place or for tax evasion runs against the doctrine of *Byers*.[10]

In our view Pickles's and the Olivers' self-incrimination claims based on the United States and Alaska Constitutions must be rejected. Neither Pickles nor the Olivers have shown any real hazard of incrimination in the context of investigations to determine civil tax liability.[11]

## C. In camera hearings.

■ In the course of both proceedings below, it was suggested that the taxpayers

---

**10.** Our holding embodies rejection of the argument that the danger of criminal prosecution for failure to file a return or to pay taxes is apparent when a taxpayer asserts the privilege regarding information about income. We need not decide whether the privilege is validly invoked when there is a specific showing of a danger of criminal prosecution for a violation of the tax laws. *Cf. United States v. Carlson*, 617 F.2d 518 (9th Cir.), *cert. denied*, 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 468 (1980) (distinguishing, for purposes of assessing validity of defense of privilege against self-incrimination in prosecution for failure to file return, situations in which information revealed would incriminate defendant under tax laws from situations in which information revealed would incriminate defendant other than under tax laws; in former case, privilege does not apply).

Recent federal cases have not considered a taxpayer's wholesale resistance to a summons for records in his possession to be justified by Fifth Amendment claims where the summons was issued pursuant to a good-faith civil investigation to determine tax liability, despite a lack of assurance from the IRS that the information would not lead to criminal prosecution under the tax statutes or other laws. *See United States v. French*, 442 F.Supp. 166 (N.D. Iowa 1977), *aff'd*, 567 F.2d 351 (8th Cir. 1978); *see also Russell v. United States*, 524 F.2d 1152 (8th Cir. 1975); *United States v. Ponder*, 475 F.2d 37 (5th Cir. 1973). The burden is still on the taxpayer to assert the privilege as to particular documents, and to provide the court with some basis for the claim that providing the documents would tend to incriminate him. *United States v. Ponder, id.* at 39.

**11.** The use of the administrative summons in this case invokes another line of case law dealing with the "zone of privacy" within which a citizen is entitled to protection from a validly issued summons. This "zone of privacy" was found, in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), to have been created by the Fourth and Fifth Amendments.

The nature and scope of this "zone of privacy" have been modified considerably since *Boyd*. *See* Note, *The Life and Times of Boyd v.*

might better be able to articulate their specific objections to the questions if given the opportunity to explain their positions to the judge in camera. The state in both cases indicated its willingness to acquiesce.

From the records before us, it appears that the Olivers were informed that they had a right to an in camera hearing and did not choose to pursue it. Pickles, on the other hand, expressed a desire for an in camera hearing without having been explicitly informed that he had a right to such a hearing, and his request, although never formally denied, was not granted.[12]

We think that this denial requires a remand of Pickles's contempt citation. He should be given an opportunity for an in camera hearing,[13] and, if it appears to the superior court that his objections to the particular questions, as articulated in this hearing, do meet the standards laid out above, then his contempt citation should be vacated.

On the other hand, since the Olivers turned down an offer for an in camera hearing, this holding does not affect the validity of their citation.[14]

V. Whether the Department of Revenue's summons violated Pickles's rights against unreasonable searches and seizures.[15]

The Fourth Amendment to the United States Constitution and its Alaskan counter-

---

*United States (1886–1976)*, 76 Mich.L.Rev. 184 (1977); Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments*, 90 Harv.L.Rev. 945, 946 (1977). Most relevant for our purposes, the Supreme Court, in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), set about disentangling the Fourth and Fifth Amendment aspects of *Boyd*. The Court emphasized that the Fifth Amendment protects against compelled self-incrimination, not the disclosure of private information; and that, unless private information met the Fifth Amendment requirements of being compelled, self-incriminating, and testimonial, any protection of such private information would stem from the Fourth Amendment or other sources, not from the Fifth Amendment. *Id.* at 401, 96 S.Ct. at 1576, 48 L.Ed.2d at 50. We read *Fisher*, in its emphasis on the fact that the information sought must be incriminating, as well as compelled and testimonial, as incorporating the holdings noted above to the effect that there must be some substantial and real hazard of incrimination, not just trifling or imaginary dangers, *Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889, 901 (1968), and that a blanket refusal to provide information sought by tax agencies, as opposed to individual objections to specific questions, is not protected by the Fifth Amendment, *United States v. Sullivan*, 274 U.S. 259, 263, 47 S.Ct. 607, 71 L.Ed. 1037, 1039 (1927). Since the taxpayers here have made an insufficient showing of the possibility of incrimination, the element of privacy adds nothing to their Fifth Amendment claims.

We need not decide whether, in interpreting the parallel privilege against self-incrimination in the Alaska Constitution (art. I, § 9), we will follow the approach of the majority or the dissent in *Fisher*.

**12.** Although Pickles might have waived any opportunity for an in camera hearing in that he did not demand one more forcibly, we do not think we can find any waiver on this record. Pickles, the judge, and the prosecutor were all cooperating in a fairly informal atmosphere, attempting to resolve the dilemma. The judge noted that two ideas had been suggested: an in camera hearing, and an attempt to obtain a grant of immunity from the federal government. Although Pickles expressed a desire for the former as well as the latter, the discussion concentrated on the possibility of immunity, and the in camera hearing suggestion apparently was forgotten. The proceedings were suspended pending a response from the United States Attorney's office, and at the point that that office's refusal was communicated to the court, Pickles was not present. Since Pickles was appearing *pro se*, a finding of waiver would be inappropriate on this record.

**13.** We express no opinion whether either the federal or state constitution guarantees an in camera hearing under these circumstances. The right to such a hearing was stipulated below.

**14.** It is conceivable that the Olivers, having obtained a clarification of the law from this court, may wish an opportunity to articulate more completely their specific grounds for refusing to answer individual questions. Should they desire to do so in camera, it would be appropriate to grant them such an opportunity.

**15.** The Olivers did not raise this issue in their appeal. If Pickles prevails on this ground his

part, Alaska Const. art. 1, § 14, both protect a person's papers against "unreasonable searches and seizures." The Fourth Amendment's role as an absolute prohibition against seizure of documents considered to be within the sphere of "private" or "personal" papers of an individual, regardless of whether their production is compelled by subpoena or actual seizure, traces back to *Boyd v. United States*, 116 U.S. 616, 621–22, 6 S.Ct. 524, 527–528, 29 L.Ed. 746, 748 (1886).[16] This doctrine has been eviscerated through the years as the Supreme Court, in cases involving electronic eavesdropping and more traditional intrusions on privacy, has moved away from a consideration of the nature of the evidence "seized" to an analysis of the procedural safeguards under which the seizure occurred.[17] *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), explicitly considering the Fifth Amendment and procedural safeguards associated with search and seizure, is indicative of this trend, holding that business records prepared by a sole practitioner lawyer for his own use could be seized from his possession so long as the warrant for the search of his office met the requirements of probable cause and specificity, and the oth-

er procedural requisites of reasonableness delineated in past cases. 427 U.S. at 474, 96 S.Ct. at 2745, 49 L.Ed.2d at 639.[18]

Pickles maintains that the summons was unreasonable because it constituted a "warrantless" search, or a "fishing expedition." This argument seems misguided. Although *Boyd v. United States* equated the forced production of documents through subpoena with a seizure, 116 U.S. at 621–22, 6 S.Ct. at 527–528, 29 L.Ed. at 748, this rationale is no longer followed with respect to an administrative summons:

> Neither the literal language of the [Fourth] Amendment nor the history which led to its adoption supports the idea that the Amendment limits the use of judicially enforceable subpenas which require testimony or the production of designated books and records. . . .
>
> Except for limitations concerning breadth and relevancy, the Fourth Amendment does not now restrict an administrative subpoena for records or an administrative requirement of reports.

1 K. Davis, *Administrative Law Treatise* § 3.05, at 180–81 (1958) (footnotes omitted).[19]

---

contempt citation would be void regardless of the resolution of his self-incrimination claim discussed above. Thus, we consider the point.

**16.** *See* Note, *The Life and Times of Boyd v. United States (1886–1976)*, 76 Mich.L.Rev. 184, 185–88 (1977).

**17.** *See* Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments*, 90 Harv.L.Rev. 945, 968–71 (1977). *See also* Weinreb, *Generalities of the Fourth Amendment*, 42 U.Chi.L. Rev. 47, 69–70 (1974).

**18.** The *Fisher* opinion also made it obvious that the protection afforded private documents is not absolute, stating:

> The Framers addressed the subject of personal privacy directly in the Fourth Amendment. They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue.

425 U.S. at 400, 96 S.Ct. at 1576, 48 L.Ed.2d at 50. *Fisher* noted that "special problems of privacy" might be presented by the subpoena

of a personal diary. *Id.* at 401 n.7, 96 S.Ct. at 1576 n.7, 48 L.Ed.2d at 50 n.7.

**19.** This was the express holding in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), concerning a subpoena issued to a corporation in the course of investigations under the Fair Labor Standards Act:

> The short answer to the Fourth Amendment objections is that the records in these cases present no question of actual search and seizure, but raise only the question whether orders of court for the production of specified records have been validly made; and no sufficient showing appears to justify setting them aside. No officer or other person has sought to enter petitioners' premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections, which in fact were made. Nor has any objection been taken to the breadth of the subpoenas or to any other specific defect which would invalidate them.

*Id.* at 195, 66 S.Ct. at 498, 90 L.Ed. at 622 (footnotes omitted). Because no physical inva-

Furthermore, arguments paralleling Pickles's unlawful search and seizure contentions have been rejected in cases where private records comparable to those sought here were subpoenaed by the IRS from the possession of an individual taxpayer. *United States v. Silkman*, 543 F.2d 1218 (8th Cir. 1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); *United States v. DeGrosa*, 405 F.2d 926 (3d Cir.), *cert. denied*, 394 U.S. 973, 89 S.Ct. 1465, 22 L.Ed.2d 753 (1969). *See also United States v. French*, 442 F.Supp. 166 (N.D.Iowa 1977).

■ In light of the foregoing, we conclude that since the summons in the Pickles case is reasonably specific, asks only for material relevant to a legitimate tax inquiry, and is enforceable only by court order, Pickles's search and seizure claims under the federal and Alaska constitutions must be rejected.

VI. Whether enforcement of the summonses would violate Pickles's and the Olivers' right to privacy embodied in art. I, § 22 of the Alaska Constitution.

■ Both Pickles and the Olivers also argue that compelled production of their records would violate the explicit protection of privacy granted in Alaska Const. art. I, § 22.[20] Our past decisions indicate that this protection may go beyond that afforded by the penumbral rights associated with the federal constitution. *State v. Glass*, 583 P.2d 872, 878–79 (Alaska 1978) ["*Glass I* "]. The state concedes that an individual's privacy interest in the information sought is within the zone of privacy protected by art. I, § 22, and language in *Glass I* alludes to personal finances as one kind of information within an individual's expectation of privacy. *Glass I*, 583 P.2d at 878.

The protection given to interests within this provision's scope is not absolute, however. *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975). The required level of justification turns on the precise nature of the privacy interest involved. *Falcon v. Alaska Public Offices Commission*, 570 P.2d 469, 476 (Alaska 1977). The question involves a balancing of "the nature and extent of the privacy invasion and the strength of the state interest requiring disclosure." *Id. Falcon* indicates that even where the state interest is sufficiently compelling to justify intrusion upon the individual's interest, the invasion must be carried out "by the least intrusive method." *Id.* at 477.

sion of privacy associated with the search of a person or premises accompanies an administrative demand for documents, the requirement of an adversary hearing before a court prior to judicial enforcement of an administrative summons supplies a procedural safeguard against abuse of legal process equivalent to the warrant requirement for a traditional search. *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

*Oklahoma Press Publishing Co.* went on to state that no requirement of "probable cause" or other prerequisites to a search warrant are needed to justify an administrative subpoena:

It is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command. . . . The requirement of 'probable cause, supported by oath or affirmation' literally applicable in the case of a warrant is satisfied, in that of an order for production, by the court's determination that the investi-

gation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry. Beyond this the requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry.

327 U.S. at 208–09, 66 S.Ct. at 505–506, 90 L.Ed. at 629–30 (footnotes omitted). *See also United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975); *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

20. Neither party argues that a right to privacy under the federal constitution has been violated beyond that encompassed within the Fourth and Fifth Amendments. Such a claim was rejected in *United States v. Silkman*, 543 F.2d 1218, 1220 (8th Cir. 1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977).

The state cites cases, several of which have been noted previously, which recognize the necessity of self-reporting and enforceable investigation processes to the operation of the income tax system,[21] and the validity of the state's power to tax incomes. The state also emphasizes that the degree of invasion of privacy in this case is not as great as the invasion in issue in *Falcon*, which held that a conflict of interest law which had the effect of requiring a doctor to disclose the names of his patients violated art. I, § 22 in the absence of regulations fashioned to protect certain classes of physicians' patients. The distinction argued is that the disclosure does not violate a traditional privilege associated with confidentiality, as between doctor and patient, and that the confidentiality of tax information is protected by statute in AS 43.05.230, a limitation upon disclosure which *Falcon* recognized would reduce the degree of invasion of privacy. 570 P.2d at 479.

In light of the unchallenged validity of the state's taxing power and the agreement among the cases that self-disclosure and the accompanying power to summon records is necessary to implement the tax system, we conclude that the state has a compelling interest justifying the invasion of privacy sought here. Given the lack of connection between most information sought on a tax return and a person's more intimate concerns and the confidentiality protections afforded by AS 43.05.230, we further conclude that this interest outweighs any privacy rights violated by compulsion to fill out the form or testify before a revenue agent.

We also conclude that, generally, self-disclosure, accompanied by appropriate use of the summons power, constitutes the least intrusive method of obtaining the information. We think it appropriate to note, however, that the strength of the privacy interest may vary with the nature of the financial records sought, and that this must be taken into account in ascertaining the "least intrusive method." Most of the records sought by the government fall into the category of records in which the legitimate expectation of privacy is lowered because such records, in the course of their use, are bound to be seen by others.[22] The records demanded of the Olivers were W–2 forms or other pay records received from employers, bank statements, credit union statements, and copies of federal tax returns, all of which fall within this category. The summons directed at Pickles was worded more broadly, directing him to produce "all books, records, and papers necessary to determine the correct Alaska Individual Net Income Tax Liability for the year 1977. This may include but is not limited to the following: cash receipts and disbursement records, checking and saving account records, stock and real estate records, all W–2 forms or pay records from all employers[,] workpapers, ledgers, journals, etc."

In accordance with the principle that the information must be obtained by the least obtrusive means, we think that the scope of this summons must be limited to require submission only of those of Pickles's papers, journals, ledgers, and the like which, in the course of their use, would be seen by other people not in a confidential relationship with him (*e. g.*, attorneys). It has not yet been shown that Pickles's tax liability cannot be determined on the basis of these "public" papers, and although we have grave doubts concerning the permissibility of summonsing "purely private" papers in the event that the tax liability cannot be determined without them, we do not decide that issue at this time. Under this interpretation, such items as checking and savings account records, W–2 forms, or other pay records must be produced under the

---

21. *See, e. g., United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975); *Heligman v. United States*, 407 F.2d 448, 451–52 (8th Cir.), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2129, 23 L.Ed.2d 765 (1969).

22. *Cf. United States v. Brown*, 600 F.2d 248, 256 (10th Cir.) (no legitimate expectation of privacy in cancelled checks and deposit slips), *cert. denied*, 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979); *United States v. Werner*, 442 F.Supp. 238 (S.D.N.Y.1977) (cancelled checks bear no element of confidentiality because others are bound to see them in the course of their use).

summons. We reserve judgment on the permissibility of requiring the production of "purely private" papers until such time as it has been shown that the tax liability cannot be computed from the "public" papers alone and the issue has been presented and argued to us.

### VII. Conclusion.

The taxpayers in the cases before us are correct in arguing that the Department of Revenue, in its information-gathering activities, must demonstrate a due regard for individuals' privacy rights and the privilege against self-incrimination. To expand these rights to the extent urged by the taxpayers, however, would render unworkable virtually any income tax system.

The taxpayers readily acknowledge that fact, and, indeed, urge this court to enable Alaska to become "the seventh flame in a beacon that will lead our country back into the heady brilliance of personal liberty from the gathering dusk of progressive tryanny" by striking down Alaska's personal income tax. The most straightforward response to the taxpayers here is that such a decision is properly one for the legislature, not the judiciary. Indeed, the legislature has accomplished exactly the result advocated by these litigants.[23] This court is not empowered to prohibit an income tax, for our role is limited to ensuring that whatever income tax the legislature chooses to enact does not contravene the privilege against self-incrimination, the right to privacy, and other provisions of the federal and Alaska constitutions.

The superior court judgment in each case is REVERSED and REMANDED for further proceedings consistent with this opinion.

MATTHEWS, Justice, dissenting in part and concurring in part.

I agree with parts I, II, III and V of the majority opinion and disagree with parts IV and VI.

### I

The key holding of part IV is that the taxpayers have made an insufficient showing that there is a real possibility, as opposed to a "trifling or imaginary" one, that they will be incriminated if they comply with the summons. I am at a loss to understand what this conclusion is based on.

AS 43.20.335(c) makes it a crime for any person required to file an income tax return to willfully fail to do so. For the years in question here, all persons making more than a rather low minimum amount of income were required to file such returns. The documents sought by the State will obviously reveal the taxpayers' incomes. Since they have not filed income tax returns[1] for the years in question, there is a distinct possibility that the documents will serve to incriminate them. The burden imposed on one asserting the privilege against self-incrimination to show that there is a real possibility of prosecution as opposed to a trifling or imaginary one should not be heavy. One should not be made to confess to a crime in order to use the privilege. Only where it *clearly* appears that the person claiming the privilege is mistaken in his fears of prosecution should he be forced to answer. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 816, 95 L.Ed.

---

**23.** Ch. 2, Second Special Session, SLA 1980.

**1.** Signing a blank return which does not disclose any financial information is the equivalent of filing no return. *See United States v. Brown,* 600 F.2d 248, 251 (10th Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979); *United States v. Dillon,* 566 F.2d 702, 703 (10th Cir. 1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1613, 56 L.Ed.2d 63 (1978); *United States v. Irwin,* 561 F.2d 198, 201 (10th Cir. 1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 725, 54 L.Ed.2d 755 (1978); *United States v.*

*Hoopes,* 545 F.2d 721, 722 n. 1 (10th Cir. 1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 270 (1977); *United States v. Silkman,* 543 F.2d 1218, 1219 (8th Cir. 1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); *United States v. Jordan,* 508 F.2d 750, 752 (7th Cir. 1975); *United States v. Daly,* 481 F.2d 28, 29 (8th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973); *United States v. Porth,* 426 F.2d 519 (10th Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970).

1118, 1124 (1951). The facts in this case fall far short of such a demonstration.

In *Oliver*, the trial court specifically found that there was a real chance of prosecution stating:

> This court finds ... that the defendant had not in fact filed a meaningful return and could very well be subject to prosecution by both state and federal authorities for failure to file in which his records, particularly bank statements, could tend to incriminate him if in fact he had any substantial income at all.

It is doing no more than pointing out the obvious to state that there is a good possibility that Pickles and the Olivers are guilty of the crime of failing to file a required tax return; that the information sought by the state is likely to be incriminating; and that there is no assurance that the state would not use the information in a prosecution, or supply it to the federal government which could use it in prosecuting the cognate federal crime. I find it not a little disturbing that the court, in the face of these facts, has simply asserted that neither Pickles nor the Olivers face any real hazard of incrimination.

However, merely concluding that there is a real hazard of incrimination does not mean that the privilege against self-incrimination applies to all of the documents which the state has demanded. While the privilege does guard against the compulsory production of one's private papers,[2] it is only private papers that are protected. Justice Brennan, in his concurring opinion in *Fisher v. United States*, 425 U.S. 391, 414, 96 S.Ct. 1569, 1582, 48 L.Ed.2d 39, 58 (1976), reviewed the kinds of documents that are, and are not, protected by the privilege:

> Production of documentary materials created or authenticated by a State or the Federal Government, such as automobile registrations or property deeds, would seem ordinarily to fall outside the protection of the privilege. They hardly reflect an extension of the person.

Economic and business records may present difficulty in particular cases. The records of business entities generally fall without the scope of the privilege. But, as noted, the Court has recognized that the privilege extends to the business records of the sole proprietor or practitioner. Such records are at least an extension of an aspect of a person's activities, though concededly not the more intimate aspects of one's life. Where the privilege would have protected one's mental notes of his business affairs in a less complicated day and age, it would seem that that protection should not fall away because the complexities of another time compel one to keep business records. *Cf. Olmstead v. United States*, 277 U.S. 438, 474, 48 S.Ct. 564[, 571], 72 L.Ed. 944, 66 A.L.R. 376 (1928) (Brandeis, J., dissenting). Nonbusiness economic records in the possession of an individual, such as canceled checks or tax records, would also seem to be protected. They may provide clear insights into a person's total lifestyle. They are, however, like business records and the papers involved in these cases, frequently, though not always, disclosed to other parties; and disclosure, in proper cases, may foreclose reliance upon the privilege. Personal letters constitute an integral aspect of a person's private enclave. And while letters, being necessarily interpersonal, are not wholly private, their peculiarly private nature and the generally narrow extent of their disclosure would seem to render them within the scope of the privilege. Papers in the nature of a personal diary are a fortiori protected under the privilege.

425 U.S. at 426–27, 96 S.Ct. at 1588–1589, 48 L.Ed.2d at 65–66.

The summons directed to the Olivers clearly did not include protected private papers. Therefore, I concur in the result reached by the majority with respect to *Oliver*. Regarding *Pickles*, the state's summons is broad enough to include private papers and to that extent Pickles was privileged to decline to comply with the sum-

2. *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) has not been overruled on this point, and is therefore controlling authority.

mons. I would therefore reverse and remand *Pickles* with directions to the trial court to narrow the summons to seek only material which is not protected, and to enforce the summons as so narrowed.

## II

Although the foregoing explains my position on how this case ought to be decided, I am constrained also to state my disagreement with part VI of the majority opinion concerning the privacy clause of the Alaska Constitution. The majority's holding on this point is that the privacy clause protects the documents prepared personally by Pickles from disclosure to the state at least until the state shows that those documents are needed in order to determine Pickles' tax liability. This holding, while innovative, is both too narrow and too broad.

It is too narrow because the protection afforded is ephemeral. One is assured that one's private papers are protected only so long as they are not needed. In contrast, the privilege against self-incrimination provides unconditional protection so long as the possibility of prosecution remains.

The majority's holding is also too broad because it applies regardless of the hazard of incrimination. If immunity from prosecution were granted Pickles, I would see no reason not to require the production of his personally prepared financial records based solely on a showing of relevance, rather than necessity. The Department of Revenue is under a statutory obligation not to disclose or publish such materials, AS 43.-05.230, and therefore there is no danger that one's personal affairs will be made public. I fail to see how it is any greater invasion of privacy to be made to turn over one's personally prepared financial records to the Department of Revenue, than it is to be required to file an income tax form calling for the details of one's annual income and expenditures.

Moreover, if the privacy clause of our state constitution protects private papers from production to the Department of Revenue except on a showing of necessity, it should shield such documents from production in an ordinary civil case, except upon a similar showing. This is contrary to current law, which requires only a showing of relevance.[3] The wisdom of this standard is supported by quite a lot of accumulated experience,[4] and I would not favor changing it. On the other hand, if it is not to be changed, the court will need to hold that the privacy clause protects private papers from compulsory production under AS 43.-05.040, except upon a showing of necessity, but not under Civil Rules 26 and 34. I doubt that such a distinction can responsibly be made.

---

**3.** Alaska R.Civ.P. 26(b)(1) provides:

(b) *Scope of Discovery.* Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1) *In General.* Parties may obtain discovery regarding any matter, not privileged which is relevant to the subject matter involved in the pending action, whether it relates to the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

**4.** *See e.g.,* 4A Moore's Federal Practice ¶ 34.08 pp. 34–59 to 34–86 (2d ed. 1981).